JACOB TAMM *et al.*

*v.*

FRANCIS LAVALLE, Supervisor.

1. SPECIFIC PERFORMANCE—*when granted.* The specific performance of contracts is within the sound discretion of the court. To entitle a party to a decree for a performance of the agreement, it must be reasonable, fair

and equitable. If wanting in any of these particulars specific performance should never be granted, for it is only on the principle that it is unjust and inequitable to permit the contract to remain unexecuted that a court of chancery assumes jurisdiction to enforce it.

2. SAME—*never enforced when it would involve breach of official duty.* The court should never compel the specific performance of a contract which would involve the breach of duty of an officer or trustee or the perversion of trust funds or property,—for a court of equity also has jurisdiction to preserve and prevent the misapplication of such a fund.

3. SAME—*when contract tainted with fraud.* The court will not enforce a contract tainted with or into which fraud has entered, or when wrong and injustice would be inflicted on the parties or others. To entitle a party to relief he must come into court with clean hands and a cause that appeals to equity for relief.

4. The supervisor of the village of Cahokia was authorized by statute to cause the commons of the village to be surveyed, platted and the plat recorded, and to lease the same for a term of not exceeding one hundred years to the highest bidder at a public letting, after due advertisement, and the statute provided that the proceeds arising from such leasing should be applied to the education of the children of the inhabitants of the village. Power was also given the supervisor to lease the lots at private letting at the average rent of other lots leased. Appellants submitted a proposition to the supervisor to lease a portion of the commons for ninety-nine years at an annual ground rent of twenty-five cents an acre and a cash bonus of $10,000. This proposition was submitted to the inhabitants of the village, and they voted in favor of accepting it, on the understanding that the bonus should be divided amongst the inhabitants. Appellants were at this meeting and were aware of the design to misapply the trust fund, and that it was a scheme of the inhabitants and supervisor to defraud the school fund. The average rent of other lots was sixty cents per acre : *Held,* the contract to lease would not be specifically enforced in favor of the complainants.

5. PUBLIC OFFICER—*persons dealing with, must take notice of his powers and duties.* A public officer derives all his powers from, and his duties are prescribed by the statute, and all persons dealing with him in reference to public affairs are bound to take notice of those powers and duties, and see that he is acting within the scope of his authority.

APPEAL from the Circuit Court of St. Clair county; the Hon. WILLIAM H. SNYDER, Judge, presiding.

Messrs. G. & G. A. KŒRNER, and Mr. R. E. ROMBAUER, for the appellants:

There is no averment in the answer that the contract sought to be specifically enforced is inequitable, or that it is not fair in all its parts, and this in all cases of this character must be raised by answer, if such defence is attempted. *Erwin* v. *Parham et al.* 12 How. U. S. 197.

The discretion of the chancellor, on which the right for specific performance is said to rest, is not an arbitrary will, but a judicial discretion, subject to certain definite and well ascertained rules. Bispham's Principles of Equity, § 37 ; Story's Eq. Jur. §§ 716, 717, 729 ; *Frisby* v. *Ballance,* 4 Scam. 287.

When a contract is in writing, is certain, is fair in all its parts, is for adequate consideration, and is capable of being performed, it is as much a matter of course for courts of equity to decree a specific performance as it is for a court of law to give damages for the breach thereof. *Chance* v. *Beall,* 20 Ga. 144 ; *Rogers* v. *Saunders,* 16 Me. 92 ; *Hopper* v. *Hopper,* 16 N. Y. Eq. 147 ; *St. Paul Div.* v. *Brown,* 9 Minn. 157 ; Taylor Land. and Tenant, § 46.

Specific performance will be decreed even in cases where the vendor after the making of the contract and prior to the filing of the bill has parted with the title to one having notice of complainants' rights, and of course much more so when he parts with the title after the filing of the bill, as in this case. *Dement* v. *Bonham,* 26 Ill. 158.

Mr. R. A. HALBERT, and Mr. M. MILLARD, for the appellee:

The intention of the contract sought to be enforced was to divert a trust fund, and the complainants had knowledge of that fact. One kind of unfairness which stays the interference of the court arises wherein the enforcement of the contract would be injurious to third persons. Fry on Specific Performance, 113. And again, where trustees entered into an agreement for a lease which was in excess of their power, and again,

where they entered into a covenant for renewal which was *ultra vires*, the court, on this ground, in both cases refused specific performance. Id. 114.

The doctrine does not apply alone to persons standing in position of formal trustees, but, it seems, to all cases of trust and confidence. So that if a contract were the result of a gross breach of trust by an agent toward his principal, the court would not, it seems, enforce the consequences of the act. And so, railway directors being trustees for the shareholders and perhaps for the public also, the court will not enforce any agreement amounting to a breach of trust, to the prejudice of all or any of the shareholders, at the instance of a plaintiff cognizant of the circumstances. Fry on Spec. Perf. 115; 2 Chitty on Cont. 11 ed. pp. 1468, 1471, 1472.

So in reference to corporations. Where a corporation is created by an act of parliament for particular purposes with special powers, their deed, though under their corporate seal, and that regularly affixed, does not bind them if it appears by the express provisions of the statute creating the corporation, or by necessary or reasonable inferences from its enactments, that the deed is *ultra vires*, that is, that the legislature meant that such deed should not be made. Fry on Spec. Perf. 147, 148.

The mere fact that a contract made by the directors is *ultra vires* as between them and the shareholders, does not necessarily disentitle the other party to the contract to sue upon it at law. Where he acts *bona fide* and without knowledge that the transaction is any misapplication of the funds of the company, he may enforce the contract in equity, but not if he have such knowledge. Fry on Spec. Perf. pp. 152, 153.

So, if the charter of the corporation prescribes a particular mode in which the property of the corporation shall be disposed of, that mode shall be pursued. 2 Dillon on Mun. Corp. § 447, and notes.

A person dealing with an agent or trustee is bound at his peril to see that the agent has authority to make the sale, be-

fore he purchases. *Peabody* v. *Roach*, 46 Ill. 242; *Davidson* v. *Whithorne*, 57 id. 300.

Where any reprehensible means are used in obtaining the making of a contract, equity will never enforce a specific performance. *Taylor* v. *Merrell*, 55 Ill. 60.

A court of equity must be satisfied that the claim is fair, just and reasonable, the contract equal in all its parts, and founded on a valuable consideration, before it will decree a specific performance, and then the court is not bound to give the extraordinary relief of specific performance, unless it is fair and honest to call for its execution. *Taylor* v. *Merrell*, 55 Ill. 61.

A court of equity will not lend its aid to decree the specific performance of a contract which grows directly out of another which is illegal, immoral, or tainted with champerty. *Bowman* v. *Cunningham*, 78 Ill. 48.

If it appears the contract is unfair, unjust or dishonest, the court will not lend its aid. *Bradford* v. *Wightman*, 78 Ill. 433. Or procured by dishonesty. *Mitchell* v. *King*, 77 Ill. 462.

As complainants knew of the intended breach of trust, as they suggested means to accomplish it, as they insisted on its performance after a court of equity had intervened to prevent it, they must be held to be coadjutors in the fraud. 2 Story Eq. Jur. § 1131 *a*, and notes. *McConnell* v. *Hodson*, 2 Gilm. 640; *Makepeace* v. *Moore*, 5 Gilm. 474; *Easton* v. *Clark*, 35 N. Y. 225.

In view of the authorities cited, there is no case made for specific performance.

Mr. CHIEF JUSTICE WALKER delivered the opinion of the Court:

This was a suit in equity, brought by appellants in the St. Clair circuit court, against appellee, to compel the specific performance of a contract for a lease of a portion of the Cahokia Commons.

The authority of the supervisor to lease these commons is

conferred by an act of the General Assembly approved on the 17th day of February, 1841, (Sess. Laws, p. 65,) and an act approved on the 18th day of February, 1857, (Private Laws, p. 1203). By the former act the supervisor of the village was authorized to cause the commons of the village to be surveyed, platted and recorded, and to lease the same for a term of not exceeding one hundred years. The act requires the supervisor to advertise, as therein prescribed, the time and place of the letting of the lots, etc., and at the time and place named in the notice to offer the lots, and to lease them to the highest bidder. The act requires the proceeds arising from such leases, after defraying expenses, to be applied to the education of the children of the inhabitants of the village. The latter act also empowered the supervisor to lease the lots at private sale, but this act limits the power to so lease to the average rent of the other lots leased.

In the early part of the year 1872 the supervisor advertised that he would lease the property in controversy, and on the 20th of February, 1872, appellants submitted to the supervisor this proposition:

"*St. Louis, February* 20, 1872.

*To the Supervisor of the Village of Cahokia:*

Sir:—We will lease of the inhabitants of the village of Cahokia, for ninety-nine years, that part of the commons of Cahokia not already sold or leased by the inhabitants which is bounded south by lands leased to the St. Louis and Cahokia Ferry Company, north by northern line of the commons of Cahokia (survey 759), east by the western line of the third sub-division of the commons, and west by the present main channel of the Mississippi river. We make the offer with the understanding that F. H. Cobb has a pretended claim to part of the ground, and that a part of it is leased to the St. Clair Railroad Company. We offer an annual ground rent of twenty-five cents an acre, and will pay a cash bonus of $7500 upon receipt of a lease made accordingly. Or, we will pay $10,000 for fee simple title to the above described lands."

Which was accepted in these terms:

"*Cahokia, February* 20, 1872.

*Messrs. Jacob Tamm, James Taussig and G. H. Timmermann.*

Gentlemen:—Your proposition for leasing the land of the Cahokia Commons, made to us this day in writing, is accepted, and the lease will be made as soon as the land is surveyed and platted according to law.

Frank Lavalle,
*Supervisor of Cahokia.*"

But appellee was restrained by injunction from making the lease. He has ever since declined to do so, and hence this suit to compel a specific performance of the agreement.

The evidence shows that the supervisor called a meeting of the inhabitants of the village to determine whether he should accept the proposition, before he did so, and a majority voted in favor of it, on the understanding that the bonus named in the offer should be divided amongst the inhabitants. Before the offer was accepted, however, appellants increased the proposed bonus to $10,000. Appellants were at this meeting of the inhabitants, and Taussig addressed a few remarks to the meeting in reference to the advantages the village would derive from the lease, by the improvements they would place upon the land. But he and the other complainants deny that they advised or gave it as their opinion that the bonus could be thus distributed.

It appears that at the time the proposition was made and accepted, the average rent per acre for lots already leased was sixty cents, and it is not claimed that this was a public leasing. There is also some evidence that one of the complainants offered ferry tickets which were transferable, and to run ninety-nine years, to two or three of the inhabitants of the village, provided the lease should be granted. There is evidence that one of the complainants gave it as his opinion that the money could be thus distributed. The testimony shows that when the inhabitants learned that the bonus could not be divided amongst them, they were unwilling that the lease should

be made, and they had, at a former meeting, agreed that the property should not be leased for less than $30,000.

Whilst equity takes jurisdiction to enforce the specific performance of contracts, it is within the sound discretion of the chancellor. To entitle a party to a decree for a performance of the agreement, it must be reasonable, fair, and equitable. If wanting in any of these particulars, relief should never be granted. It is only on the principle that it is unjust and inequitable to permit the contract to remain unexecuted, that a court of chancery assumes the power to enforce it.

Again, the court should never compel the performance of a contract which would involve the breach of duty of an officer or a trustee, or the perversion or destruction of trust funds or property. A court of equity takes jurisdiction to preserve and prevent the misapplication of such a fund. Nor will it enforce a contract tainted with or into which fraud has entered, or where wrong and injustice would be inflicted on the parties or others. The court will never become a party to the enforcement of a contract by which wrong and injustice would be perpetrated. To entitle a party to relief he must come with clean hands, and a cause that appeals to equity for relief. Is this case of the character that requires the interposition of equity?

That there was a preconcerted plan on the part of the inhabitants of the village and the supervisor to fraudulently pervert the fund created and appropriated to educational purposes, there seems to be not the shadow of a doubt. It seems to have been spoken of and even discussed publicly, and was a matter of discussion at the meetings held to determine whether the people would approve the terms of the lease, and from all the circumstances in evidence we can entertain no doubt that complainants knew of the purpose to divide the $10,000 among the inhabitants. Whether or not they participated in the fraudulent and illegal purpose, they must have known of the design to most unjustly misapply a trust fund, and the palpable violation of duty by the supervisor.

He was acting under statutory authority, derived all his powers from its provisions, and his duties were thereby prescribed, and the application of the fund realized from the commons directed by the enactment, and all persons dealing with him in reference to these commons must. stand charged with a knowledge of all the duties imposed on him by the statute under which he was proposing to act. Complainants knew the supervisor was acting under the statute and derived all his powers from its provisions, and we must presume they looked to the law to see whether he was acting within the scope of his authority. This would be the presumption, independent of proof,—that they examined the law. But in this case, when the parties met to consummate the transaction, they went to Belleville to have the plat recorded as the statute required. Thus, it appears complainants had actual knowledge of the provisions of the statute under which the supervisor was acting.

Whilst it may be, as contended, that complainants were not required to see to the proper application of this trust fund after the money was paid, still they knew that the whole thing was a scheme by the inhabitants and the supervisor, devised to defraud the school fund of this money and to pervert it to the use of the inhabitants, and knowing this, they became parties to the fraud. If not intending to aid and assist in its perpetration, why offer the $10,000 as a bonus, as it was called? Why not, according to the usual course of business, make the offer so as to embrace that sum in the rent to be paid per acre for the land? The fact that the offer was made in that manner is strong evidence that complainants did so that the money might be distributed amongst the inhabitants of the village, and thus induce them to ratify the lease. The evidence shows the inhabitants were opposed to the lease unless they could participate in a distribution of the $10,000. Whether intended by complainants or not, it seems to have operated as a bribe of the people to consent to the lease, and to disarm opposition, and it may have tended to prevent litigation to restrain the

carrying of the fraudulent scheme into effect. The evidence does not explain why the bonus was offered or why a higher yearly offer per acre was not made in the usual course of business. If there were other and legitimate reasons for offering this bonus, complainants, when on the stand as witnesses, could have shown it, but they did not attempt it. The evidence, we think, tends strongly to show that they were active promoters of the fraud.

But if they did not actively engage in carrying it out, they knew of the scheme and were willing and anxious to profit by its perpetration by others, and it would be inequitable to permit, much less aid, them to do so, by decreeing a specific performance of a scheme to pervert and apply to individual use the fund created and set apart for the maintenance of schools. A court of equity will never lend its aid to carry out so inequitable an act, nor aid in squandering and destroying such a trust fund. It would shock the sense of all just men, and would obliterate all distinction between right and wrong.

It is suggested that this bonus may have been needed to erect a school house, or that it could have been loaned and thus have increased the school fund. It is no doubt true that it could have been thus appropriated. But complainants do not testify that they were informed or believed that such was the purpose. On the contrary we think it clear, from the evidence, they knew there was no such purpose, but that the fund was to be divided among the villagers. Had they been informed and believed that it was to be used in erecting such a building, or to be used in loaning it to increase the school fund of the village, or had they been ignorant of the intention of perverting it to unauthorized and illegal purposes, and the bonus had made the price per acre equal to the average rent of the lots, then it might be that relief might have been asked. But such was not the fact.

Again, the act of 1857 prohibits the supervisor from making leases otherwise than to the highest bidder, unless it should be at the average rent per acre of other common grounds already

leased. The evidence is uncontradicted that such an average was sixty cents, whilst this land was, by private contract, to be leased at twenty-five cents per acre, and as the $10,000 was to be treated as a donation in name and in fact, as a bribe to the villagers, the rent was only twenty-five cents per acre, and in palpable violation of the law authorizing the supervisor to lease the lands at private sale. Complainants must have known that this was in plain contravention of the law, and that the act of the supervisor was *ultra vires*. They were dealing with a person deriving all his powers from the statute, and it was their duty to see he was acting within the scope of his authority, and failing to do so, they could acquire no rights by a violation of the terms of the statute. It would be unheard of to decree the performance of a contract made in violation of the law under which the agent or trustee was acting. To do so in this case would be to enforce an inequitable contract and one which was made in disregard of the plain and peremptory requirements of the statute. This can not be done by a court of equity.

The evidence not only justified, but it required the court below to dismiss the bill, and that decree is affirmed.

*Decree affirmed.*